**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| **CHEETAH OMNI LLC,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 6:11cv390-LED** |
| **ALCATEL-LUCENT USA INC., CIENA CORPORATION, CIENA COMMUNICATIONS, INC., FUJITSU NETWORK COMMUNICATIONS, INC., TELLABS, INC., TELLABS OPERATIONS, INC., TELLABS NORTH AMERICA, INC., NOKIA SIEMENS NETWORKS US LLC, HUAWEI TECHNOLOGIES USA, INC.** | **Jury Trial Demanded** |
| **Defendants.** | |

**FUJITSU NETWORK COMMUNICATIONS, INC.'S RESPONSE TO
CHEETAH OMNI LLC'S MOTION TO EXCLUDE THE EXPERT TESTIMONY
OF DR. JOSEPH FORD ON LACK OF WRITTEN DESCRIPTION**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 2

        A.      Dr. Ford Is Well-Qualified to Opine on the '771, '862, and '714 Patents............. 2

        B.      Dr. Ford's Report Examines the Disclosures of the '771, '862, and '714
                Patents ................................................................................................ 3

        C.      Dr. Ford's Report Analyzes the Patent Specifications, Claim Language,
                and Cheetah's Allegations Regarding the Asserted Claims .................................. 3

III.    APPLICABLE LAW ........................................................................................... 5

IV.     ARGUMENT ...................................................................................................... 7

        A.      Cheetah's Contention That Dr. Ford's Lack of Written Description
                Testimony as to the '771 and '862 Patents Misapplies the Law Is Incorrect ........ 7

        B.      Cheetah's Effort to Exclude Dr. Ford's Lack of Written Description
                Testimony for the '714 Patent Misses the Mark.................................................. 11

V.      CONCLUSION................................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

*Am. Med. Sys. v. Laser Peripherals, LLC*,
    712 F. Supp. 2d 885 (D. Minn. 2010) ................................................................. 11

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010) .................................................................... 6, 7, 8

*Bilstad v. Wakalopulos*,
    386 F.3d 1116 (Fed. Cir. 2004) ................................................................. 7, 10, 12

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ............................................................................................ 1, 6

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .................................................................................. 6

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) ............................................................... 7, 9, 11, 12

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ............................................................... 7, 8, 9, 12

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ............................................................................ 11

*Roman v. Western Mfg., Inc.*,
    691 F.3d 686 (5th Cir. 2012) ................................................................................... 6

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
    No. 13-1047, 2013 WL 5788675 (Fed. Cir. Oct. 29, 2013) ......................... 7, 11, 12

*United States v. Posado*,
    57 F.3d 428 (5th Cir.1995) ...................................................................................... 6

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ............................................................................... 6

## I.      INTRODUCTION

Defendant Fujitsu Network Communications, Inc. ("FNC") hereby responds to Plaintiff Cheetah Omni LLC's ("Cheetah's") motion to exclude FNC's technical expert Dr. Joseph Ford ("Dr. Ford") from opining on FNC's defense of lack of written description as to U.S. Patent Nos. 6,882,771 ("the '771 Patent"), 7,116,862 ("the '862 Patent"), and 7,339,714 ("the '714 Patent"). Cheetah has not met any requirement for excluding expert opinion based on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), or Rule 702.  Indeed, Cheetah's motion disregards the guidance of the Court's Standing Order that "*Daubert* motions are appropriate for experts who are not qualified to testify, not merely experts who expound theories an opposing party disagrees with."

Cheetah contends that Dr. Ford's entire written description analysis should be excluded because of a statement that allegedly "misapplies the law."  Cheetah is incorrect because the statement is part of Dr. Ford's proper analysis comparing the asserted claims to the specification of the patents.  At issue is Dr. Ford's factual statement that the '771 and '862 Patents "do[] not describe all the methods of attenuation that could conceivably be covered by [the asserted claims]."  This statement reflects Dr. Ford's recognition that the claim requirement of "moving a moveable mirror to cause a change in the amplitude of the reflected signal" is seemingly directed to the genus of mirror-based attenuation, while the specification only describes the single species of interferometric attenuation.  The passages at issue regarding the '714 Patent are analogous because Dr. Ford's analysis simply points out that the claim requirement of "array of optical signal processing devices" located on "one or more semiconductor substrates" describes a genus, while the specification only describes a single species within that genus.  Dr. Ford's comparison between the asserted claims and the specifications of the patents is a proper (and required) methodology for conducting a written description analysis, and the statements challenged by

Cheetah are entirely consistent with and supported by the applicable law of written description.

As such, there is no basis to exclude or limit Dr. Ford's testimony.  Cheetah does not contest that Dr. Ford is qualified to opine on the factual issue of written description and does not challenge Dr. Ford's proficiency to testify as an expert.  Furthermore, none of the cited case law supports Cheetah's extreme view of permissible expert testimony on the issue of written description.  In short, Cheetah simply does not like Dr. Ford's statements and the inescapable facts that support them.  Dr. Ford's factual comparison between the specifications and the asserted claims will assist the trier of fact and thus Cheetah has no basis to argue that his opinions should be stricken.  Accordingly, FNC respectfully requests that the Court deny Cheetah's motion in its entirety.

## II.      FACTUAL BACKGROUND

### A.      Dr. Ford Is Well-Qualified to Opine on the '771, '862, and '714 Patents

As an initial matter, Dr. Ford is well-qualified to opine on the factual issue of written description, and Cheetah does not challenge Dr. Ford's proficiency to testify as an expert.  Dr. Ford holds a Ph.D. in Applied Physics and Electrical Engineering and is a professor of Electrical and Computer Engineering at the University of California San Diego and leads the Photonic Systems Integration Lab, working on physical optical systems for optical communications, solar energy, and imaging.  Ex. 1, CV of Dr. Joseph Ford.  Dr. Ford is a Fellow of the Optical Society of America.  *Id.*  Dr. Ford has authored over 50 journal publications, over 100 conference presentations and is a named inventor of forty-six U.S. patents, approximately half of which are on micro-electromechanical (MEMS) components for fiber optic communications.  *Id.*  Thus, there is no doubt that Dr. Ford is an established expert in the field of optical MEMS technology and highly capable of opining on the specifications and claims of the '771, '862, and '714 Patents.

**B.**     **Dr. Ford's Report Examines the Disclosures of the '771, '862, and '714 Patents**

Dr. Ford's expert report sets forth a description of what the specifications of the '771, '862, and '714 Patents disclose and how this relates to the scope of the claims as defined by the Court.  Dr. Ford's report provides a detailed seven-page description of the disclosure in the '771, '862, and '714 Patents.  Ex. 2, Opening Expert Report of Joseph E. Ford (excerpts) ¶¶ 24-42; *see* Ex. 3, '771 Patent, Ex. 4, '862 Patent, Ex. 5, '714 Patent.  He explains that several figures and accompanying text in the '771 and '862 Patents describe the use of interferometers in variable attenuators.  Ex. 2 ¶¶ 24-29.  He further describes that other portions of the '771 and '862 Patents concern the use of interferometers in optical switches and other devices.  *Id.* ¶¶ 29-30. After summarizing the disclosure of the '771 and '862 Patents, Dr. Ford states that the specification "does not describe any way of attenuating the amplitude of an output signal other than by altering the relative phases of two or more copies of the signal using an interferometer that has a moveable mirror as part of a MEMS device."  *Id.* ¶ 31.  Cheetah does not contest Dr. Ford's description of the disclosure of the '771 or '862 Patents.

Regarding the '714 Patent, Dr. Ford describes the disclosure of a variable blazed grating for processing an optical signal using diffraction that results from illuminating multiple mirror facets.  *Id.* ¶ 36.  He examines the other figures of the '714 Patent and observes that each of them involves the use of variable blazed gratings in other optical devices.  *Id.* ¶¶ 37-38.  After summarizing the disclosure, Dr. Ford states that the "'714 Patent specification does not describe any way of processing a signal other than by using a variable blazed grating apparatus."  *Id.* ¶ 39. Importantly, Cheetah does not challenge Dr. Ford's description of the '714 Patent specification.

**C.**     **Dr. Ford's Report Analyzes the Patent Specifications, Claim Language, and Cheetah's Allegations Regarding the Asserted Claims**

Dr. Ford's report applies his understanding of the specifications to the scope of the claims

as defined by the Court in determining that the '771, '862, and '714 Patents fail to satisfy the

written description requirement.  Dr. Ford begins his comparison between the asserted claims to

the specification of the '771 Patent by explaining:

> Claim 8 recites the step of "displacing the movable mirror to cause a change in the
> amplitude of the output signal relative to the amplitude of the at least one of the plurality
> of wavelengths of the optical input signal." It is my opinion that the specification of
> the '771 Patent only describes changing the amplitude of an output signal using
> Interferometric Attenuation. It does not describe any technique to cause the claimed
> change in amplitude other than Interferometric Attenuation.  *Id*. ¶ 1180.

Dr. Ford provides the same comparison between the asserted claims of the '862 Patent and

the '862 Patent specification.  *Id*. ¶¶ 1182-86.  He observes that Cheetah asserts the claims of the

'771 and '862 Patents against devices that do not use interferometric attenuation.  *Id*. ¶ 1187.  He

describes this further by stating that the "devices accused by Cheetah instead use a fundamentally

different technique that relies, in part, on specular reflection and controllably-inefficient coupling

of light to a fiber.  This technique is not described or disclosed in the '771 or '862 Patents.  Nor is

any apparatus that could perform this technique described in the '771 or '862 Patents."  *Id*. ¶

1188.

Because Cheetah is asserting the claims against devices that are not described by the

patents, Dr. Ford's statements that "the specification of the '771 Patent does not describe all the

methods of attenuation that could conceivably be covered by [the] claims … of the '771 Patent"

and "the specification of the '862 Patent does not describe all the methods of attenuation that

could conceivably be covered by [the] claims … of the '862 Patent" are factually correct.  *See id*.

¶¶ 1189-90.  Cheetah does not (and cannot) dispute the veracity of Dr. Ford's assertions.  Based

on his analysis of comparing the claims with the disclosure of the specification and Cheetah's

assertions, Dr. Ford concludes that the asserted claims of the '771 and '862 Patents would not

have been understood by a person of skill in the art to have been invented by the inventor.  *Id*. ¶¶

1191-92.

Dr. Ford provides a similar analysis in connection with the '714 Patent. As with the '771 and '862 Patents, he compares the asserted claims to the specification of the '714 Patent:

> [The asserted claims] require an "array of optical signal processing devices" located on "one or more semiconductor substrates." It is my opinion that the only "array of optical signal processing devices" located on "one or more semiconductor substrates" described in the specification of the '714 Patent includes a variable blazed grating apparatus. *Id.* ¶ 1202.

Dr. Ford recognizes that "Cheetah asserts the claims of the '714 Patent against devices that do not include or use a variable blazed grating apparatus." *Id.* ¶ 1203. He further explains that the accused devices do not use diffraction gratings but rather reflect signals off individually controllable tilt mirrors, where each wavelength signal is reflected by a single moveable mirror. *Id.* Thus, he concludes that Cheetah alleges the claims of the '714 Patent cover devices and methods that do not use a variable blazed grating apparatus for processing optical signals. *Id.*

Because Cheetah is asserting the '714 Patent claims against devices that are not described in the specification and the '714 Patent only describes processing an optical signal by using a variable blazed grating apparatus, Dr. Ford opines that "the '714 Patent's specification would not convey to a person of ordinary skill in the art that Dr. Islam described a method of processing other than by using a variable blazed grating apparatus." *Id.* ¶ 1204. Based on his analysis of comparing the claims with the disclosure of the specification and Cheetah's assertions, Dr. Ford concludes that the specification as written does not convey that Dr. Islam possessed the subject matter of the asserted claims of the '714 Patent at the time the invention was filed. *Id.* ¶ 1205. Thus, as with the '771 and '862 Patents, Dr. Ford asserts that the claims of the '714 Patent would not have been understood by a person of skill in the art to have been made by the inventor. *Id.*

## III.    APPLICABLE LAW

The admissibility of expert testimony is a question of law governed by Federal Rule of

Evidence 702 and the principles in the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).  Expert testimony is admissible if it "help[s] the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  "'To be helpful under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry.' Principally this is a matter of relevance."  *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 694 (5th Cir. 2012) (quoting *United States v. Posado*, 57 F.3d 428, 433 (5th Cir.1995)).  In other words, expert testimony is admissible if it "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  The reliability inquiry under *Daubert* is a flexible one and allows district courts to identify the germane considerations.  *Roman*, 691 F.3d at 693.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S. Ct. 2238 (2011).

Section 112 requires a patentee to provide a written description that allows a person of skill in the art to recognize that the patentee invented what is claimed.  *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed. Cir. 1991)).  The standard is whether the disclosure relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.  *Id*.  There are no bright-line rules governing the number of species that must be disclosed to describe a genus claim, as it necessarily changes with each invention and with progress in a field.  *Id*.  If the difference between species is such that a person skilled in the art would not readily discern that other species of the genus would perform similarly to the disclosed species, then disclosure of more species is necessary to adequately show

possession of the entire genus.  *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004); *see Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. 13-1047, 2013 WL 5788675, at *7-8 (Fed. Cir. Oct. 29, 2013); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1378-79 (Fed. Cir. 2009); *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-46 (Fed. Cir. 2005).

## IV.    ARGUMENT

### A.    Cheetah's Contention That Dr. Ford's Lack of Written Description Testimony as to the '771 and '862 Patents Misapplies the Law Is Incorrect

Cheetah's argument that this Court should preclude Dr. Ford from testifying on lack of written description because he allegedly "misapplies the law" is simply incorrect.  *Cf.* Dkt. No. 340 at 3-4.  Cheetah's position that the disclosure of a single species within a broadly claimed genus is sufficient is not an accurate statement of the law, as evidenced by its forced reliance on and overstatement of an outdated 1944 CCPA decision.  *See id.*  In fact, the *en banc* Federal Circuit has rejected setting "any bright-line rules governing, for example, the number of species that must be disclosed to describe a genus claim, as this number necessarily changes with each invention, and it changes with progress in a field."  *See Ariad Pharms.*, 598 F.3d at 1351.  Moreover, in contradiction of Cheetah's position, there are numerous cases where the "disclosure of more species is necessary to adequately show possession of the entire genus."  *Bilstad*, 386 F.3d at 1125; *see also Synthes USA*, 2013 WL 5788675, at *5[1] ("The parties appear to agree that 'grooves' are a species of 'opening,' but do not agree that 'grooves' constitute an adequate disclosure to claim all openings that may be used in the cover plates to anchor the fiber system."); *ICU Med.*, 558 F.3d at 1379 ("ICU fails to identify any disclosure in the specification to support its species-genus argument."); *LizardTech*, 424 F.3d at 1346 ("[A] patentee cannot

---

[1] The *Synthes* decision is the Federal Circuit's most recent statement on the law of written description and fully supports Dr. Ford's analysis.

always satisfy the requirements of section 112, in supporting expansive claim language, merely by clearly describing one embodiment of the thing claimed.").[2]  Cheetah's disagreement with this case law is not a legitimate basis for seeking to exclude Dr. Ford's properly stated opinions regarding lack of written description.

For example, in *LizardTech*, the Federal Circuit upheld the grant of summary judgment of invalidity for lack of written description of claims involving a digital image compression method using a discrete wavelet transform ("DWT").  424 F.3d at 1346-47.  LizardTech's specification provided "only one method for creating a seamless DWT, which is to 'maintain updated sums' of DWT coefficients," but the claims were directed to any method of creating a seamless DWT.  *Id*. at 1344.  The Federal Circuit upheld the invalidity determination because "a person of skill in the art would not understand how to make a seamless DWT generically and would not understand LizardTech to have invented a method for making a seamless DWT, except by 'maintaining updating sums of DWT coefficients.'"  *Id*. at 1345.

Similarly here, Dr. Ford states that the claims are asserted to cover the genus of mirror-based attenuation but the '771 and '862 Patent specifications only describe the single species of interferometric attenuation.  Ex. 2 ¶¶ 1180-87.  Dr. Ford opines that there is no evidence that the specifications contemplate any other way of attenuation that would not involve using an interferometer.  *Id*. ¶¶ 1186, 1193.  As in *LizardTech*, Dr. Ford's analysis assists the jury because it shows that the disclosure of only a single species evidences an inadequate written description, where the claims are alleged to be directed to a genus and other species within the genus would

---

[2] Further dismissing Cheetah's inflexible approach, the Federal Circuit has stated that "whatever inconsistencies may appear to some to exist in the application of the law, those inconsistencies rest not with the legal standard but with the different facts and arguments presented to the courts."  *Ariad Pharms*., 598 F.3d at 1352.

not be readily discernible from the disclosure to a person of ordinary skill in the art.  *See* 424

F.3d at 1344-47.

      As another example, in *ICU*, the specification of an asserted patent disclosed medical

valves with spikes used to add drugs to an IV.  *See* 558 F.3d at 1378. While the originally filed

claims included "spike" limitations, during prosecution, the patent applicant filed an amendment

to include "spikeless" claims, and left the specification unchanged.  *Id*. at 1377.  Affirming the

district court's grant of summary judgment of invalidity for lack of written description, the ICU

Court reasoned that:

> ICU's asserted spikeless claims are broader than its asserted spike claims because they do
> not include a spike limitation; these spikeless claims thus refer to medical valves
> generically-covering those valves that operate with a spike and those that operate without
> a spike. But the specification describes only medical valves with spikes. . . . Based on this
> disclosure, a person of skill in the art would not understand the inventor of the '509 and
> '592 patents to have invented a spikeless medical valve.

*Id*. at 1378.  Like the asserted patent in *ICU*, Dr. Ford describes that the specifications of the

'771 and '862 Patents describe only one embodiment for the claim element at issue.  Ex. 2 ¶¶ 24-

31; *see ICU Med*., 558 F.3d at 1378.  And just as the "spikeless" claims of the ICU patent

broadened the claims outside the written description of the specification, the asserted claims of

the '771 and '862 Patents do not require the elements necessary to perform interferometry.  *See*

Ex. 3, '771 Patent, Claim 8; Ex. 4, '862 Patent, Claims 1 and 18.  As with the "spikeless" claims

of the ICU patent, Dr. Ford properly opines that the asserted claims here attempt to cover

methods of attenuation beyond those conveyed to have been invented by the inventor in the

specification.  Ex. 2 ¶¶ 1180-93.  Thus, Cheetah has no basis to argue that Dr. Ford's factual

analysis "misapplies the law."

      Importantly, Cheetah does not dispute the veracity of Dr. Ford's statements in question

because the assertions that "the specification of the '771 Patent does not describe all the methods

of attenuation that could conceivably be covered by [the] claims … of the '771 Patent" and "the specification of the '862 Patent does not describe all the methods of attenuation that could conceivably be covered by [the] claims … of the '862 Patent" are undoubtedly true.

Instead, Cheetah resorts to mischaracterizing Dr. Ford's statements by claiming that Dr. Ford believes the specification "must disclose the 'methods of attenuation used by the accused devices.'"  *Cf*. Dkt. No. 340 at 4.  Dr. Ford never made such a statement and does not purport to describe what the specification must disclose.  Rather, Dr. Ford describes what the specification does and does not disclose and compares that with the alleged scope of the claims to determine that the specification as written does not convey that the inventor possessed the subject matter claimed in the asserted claims of the '771 and '862 Patents.  Ex. 2 ¶¶ 24-31, 1180-93.

In addition, Cheetah's cited case law is unavailing.  The language from *Cordis* quoted by Cheetah that a specification may "contain a written description of a broadly claimed invention without describing all species that the claim encompasses," Dkt. No. 340 at 4, does not preclude (or contradict) the factual statements made by Dr. Ford.  *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364-65 (Fed. Cir. 2003).  As described above, Dr. Ford states that the '771 and '862 Patent specifications only discloses the single species of interferometric attenuation and that the claims are asserted to cover seemingly any mirror-based attenuation, including devices that do not use interferometers at all but use a fundamentally different attenuation technique.  Ex. 2 ¶¶ 1180-93.  Thus, *Cordis* is readily distinguished from the present situation.  Dr. Ford's analysis is completely consistent with the above cited Federal Circuit precedent holding that the disclosure of only a single species is insufficient to describe a claimed invention to a genus where other species within the genus would not be readily discernible from the disclosure to a person of ordinary skill in the art.  *See, e.g., Bilstad*, 386 F.3d at 1125; *Synthes USA*, 2013 WL

5788675, at *7-8; *ICU Med.*, 558 F.3d at 1379.  Cheetah's reliance on *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) is similarly misplaced.  *See* Dkt. No. 340 at 4, 6.  The *Rexnord* decision concerned claim construction rather than lack of written description.  *See generally* 274 F.3d 1336 (considering whether the term "portion" should encompass parts that were integral with the claimed device).[3]

### B.    Cheetah's Effort to Exclude Dr. Ford's Lack of Written Description Testimony for the '714 Patent Misses the Mark

Cheetah rehashes the same argument from the '771 and '862 Patents in an attempt to exclude Dr. Ford's opinion on the '714 Patent's lack of written description.  *Cf*. Dkt. No. 340 at 5-6.  Specifically, Cheetah's contention that the single species of a "variable blazed grating apparatus" provides sufficient support for the genus of an "array of optical signal processing devices" located on "one or more semiconductor substrates" misses the mark for the same reasons as explained with regard to the '771 and '862 Patents.[4]  *See id*.

Dr. Ford properly opined, as a qualified expert, on what the '714 Patent specification discloses and how this relates to the scope of the claims as defined by the Court.  He states that the specification of the '714 Patent describes various uses of a variable blazed grating apparatus and each of the figures of the '714 Patent involves the use of variable blazed gratings in optical devices.  Ex. 2 ¶¶ 37-38.  Comparing that disclosure to the claim language, he opines that the

---

[3] Cheetah's citation to a Minnesota district court case is inapposite.  *Cf*. Dkt. No. 340 at 2-3 (citing *Am. Med. Sys. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 900-01 (D. Minn. 2010)).  Unlike the present situation, the expert there attempted to impose requirements that were not present in claims concerning an apparatus for directing laser energy.  *Id*.  The asserted claims did not "require the transmitting surface/particular area to have certain dimensions or a precise location" and thus the expert's opinion was inconsistent with the claim construction.  *Id*.  Here, by contrast, Dr. Ford has accurately described the specification and claims and properly applied the Court's claim construction, and Cheetah does not contend otherwise.
[4] The same is true of the '714 Patent claim limitation "a majority of the reflected signal is communicated in one direction."

only "array of optical signal processing devices" located on "one or more semiconductor substrates" in the specification involves the use of variable blazed grating apparatus.  *Id*. ¶ 1202. Dr. Ford recognizes that Cheetah is asserting the '714 Patent claims against devices that do not use a variable blazed grating apparatus but rather employ a different technology and arrangement involving reflective tilt mirrors to process optical signals.  *Id.* ¶ 1203.  He concludes that the '714 Patent specification does not describe any way of processing a signal without using a variable blazed grating apparatus and thus the specification as written does not convey that Dr. Islam possessed the subject matter claimed in the asserted claims of the '714 Patent.  *Id.* ¶¶ 1204-05.

Cheetah's statement that "Dr. Ford does not contend that the '714 patent specification lacks support for the claimed invention" improperly mischaracterizes Dr. Ford's opinion.  *Cf.* Dkt. No. 340 at 6.  But, the disclosure of only one species does not show possession of the entire genus.  *See Bilstad*, 386 F.3d at 1125; *Synthes USA*, 2013 WL 5788675, at *5; *ICU Med.*, 558 F.3d at 1379; *LizardTech*, 424 F.3d at 1346.  As stated above, Dr. Ford concludes that the limited specification as written does not show the inventor possessed the claimed element of "array of optical signal processing devices" located on "one or more semiconductor substrates."  Ex. 2 ¶¶ 36-39, 1202-05.

As with the '771 and '862 Patents, Cheetah mistakenly describes Dr. Ford as purporting to require that the specification of the '714 Patent describe the accused product.  *Cf.* Dkt. No. 340 at 6.  Again, Dr. Ford did not state or even imply such a requirement.  Rather, Dr. Ford's analysis follows the well-established Federal Circuit approach that a single species does not establish possession of an entire genus.  Indeed, Dr. Ford contrasts the limited variable blazed grating disclosure of the '714 Patent specification with the allegedly broader scope of the "array of optical signal processing devices" claim element to determine that the specification as written

12

does not convey that the inventor possessed the subject matter claimed.  Ex. 2 ¶¶ 36-39, 1202-05.

## V.    CONCLUSION

FNC respectfully requests that the Court deny Cheetah's motion seeking exclusion of Dr.

Ford's testimony concerning lack of written description in its entirety.


Dated: November 14, 2013                 Respectfully submitted,

                                         */s/ Lawrence T. Kass*
                                         Christopher E. Chalsen (*Pro Hac Vice*)
                                         cchalsen@milbank.com
                                         Lawrence T. Kass (*Pro Hac Vice*)
                                         lkass@milbank.com
                                         Anna Brook (*Pro Hac Vice*)
                                         abrook@milbank.com
                                         Milbank, Tweed, Hadley & McCloy LLP
                                         1 Chase Manhattan Plaza
                                         New York, NY 10005-1413
                                         (212) 530-5000; Fax (212) 822-5844

                                         Melvin R. Wilcox, III
                                         Texas Bar No. 21454800
                                         mrw@yw-lawfirm.com
                                         Yarbrough & Wilcox PLLC
                                         100 E. Ferguson St.
                                         Tyler, Texas 75702
                                         (903) 595-1133; Fax (903) 595-0191

                                         *Attorneys for Defendant Fujitsu Network*
                                         *Communications, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email on November 14, 2013.

*/s/ Lawrence T. Kass*
Lawrence T. Kass